**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| THE WHITE FAMILY TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TRINITY INDUSTRIES, INC., TIMOTHY R. WALLACE, and JAMES E. PERRY,<br><br>Defendants. | **Case No.  3:15-cv-1304**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff The White Family Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Trinity Industries, Inc., ("Trinity" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Trinity securities between February 16, 2012 and April 21, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Trinity Industries, Inc. manufactures transportation, construction, and industrial products. The Company's products include tank and freight railcars, inland hopper and tank barges, highway guardrail and safety products, ready-mix concrete, and other products. Trinity also leases railcars and other products. The Company markets its products in the United States

and internationally. The company was founded in 1933, is headquartered in Dallas, Texas, and its shares trade on the NYSE under the ticker symbol "TRN".

3.      In an article published by *Bloomberg News* on June 12, 2014, it was reported that in 1989, a company called Syro Steel Co. introduced a product named ET-2000, an energy-absorbing guardrail end terminal designed by Texas A&M University and funded by the Texas Department of Transportation. When a car hit Syro's end terminal, the mechanism would act as a buffer that would absorb energy from the crash and prevent the guardrail from spearing the car. Trinity Industries acquired Syro in 1992.

4.      Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) Trinity changed certain dimensions of the ET-Plus in 2005 without telling the Federal Highway Administration ("FHWA"), the government agency that certifies the safety of roadside hardware; and (2) as a result of the foregoing, Trinity's public statements were materially false and misleading at all relevant times.

5.      On October 12, 2014, an article was published in the *New York Times*, reporting that at least three states had banned the use of guardrail heads manufactured by Trinity. The article stated, in part:

> Because of its safety concerns, Missouri banned further installation of the rail heads on Sept. 24. It joined Nevada, which prohibited further purchases in January, and was followed six days later by Massachusetts. Lawsuits say the guardrails were to blame for five deaths, and many more injuries, in at least 14 accidents nationwide.

6.      As a result of this news, shares of Trinity fell $2.06 or 5.9%, on unusually heavy volume, to close at $32.88 on October 13, 2014.

7.      On October 14, 2014, after the close of trading, the *New York Times* published an article reporting that the State of Virginia threatened to remove guardrails sold by Trinity unless it performed additional safety tests. The article stated, in part:

> Concern is mounting over the safety of guardrails sold by Trinity Industries, as yet another state has threatened to stop buying them, and will consider removing them.

> Virginia, in a letter sent to the company on Friday, told Trinity that state transportation officials did not believe Trinity had properly tested the end of a guardrail it redesigned in 2005. Virginia officials also told Trinity, which is based in Dallas, that the company had made changes to the design without telling them.

> If the company does not conduct new tests, in the presence of Virginia officials, and provide proof to the state's Transportation Department by Oct. 24, the state will ban the product, officials said.

8.      As a result of this news, shares of Trinity fell $0.53, or over 1.5%, on unusually heavy volume, to close at $32.93 on October 15, 2014.

9.      On October 20, 2014, a jury found that Trinity deliberately withheld information from the U.S. about cost-saving changes to its highway guardrail system which made it more dangerous, ruling the company defrauded the government by $175 million. The verdict was the result of a whistleblower lawsuit, brought by Joshua Harman, which claimed that Trinity made secret design changes that transformed one of its products into a potentially lethal highway hazard, falsely passing off the product as eligible for federal funding.

10.      The same day, an article was published by *Bloomberg News*, reporting on the jury's verdict, and stating, in part:

> Damages to be awarded against the company will be tripled and added to a penalty to be determined by the judge. The total liability may reach as much as $1 billion, according to company attorneys.

> The jury's verdict comes as scrutiny of the highway safety product, called the ET-Plus, increases across the country. Earlier this month, the Federal Highway Administration asked all states to start submitting information on crashes involving the ET-Plus to the agency's safety office. Four states have banned new

installations of it on their highways, citing ongoing investigations. And the company faces more than a dozen personal injury and wrongful death lawsuits in which plaintiffs allege the product behaved defectively in car crashes.

11.     As a result of this news, shares of Trinity fell $4.42, or over 12.3%, on unusually heavy volume, to close at $31.42 on October 20, 2014.

12.     On October 24, 2014, after the close of trading, the Company issued a press release announcing that it had ceased shipments of its of ET-Plus System.

13.     As a result of this news, shares of Trinity fell $0.45 or over 1.2%, to close at $34.85 on October 25, 2014.

14.     On April 22, 2015, an article was published by *Bloomberg News*, reporting that Trinity was at the center of a Federal Criminal Probe. The article stated, in part:

> The U.S. Justice Department is conducting a criminal investigation into the use of a highway guardrail system linked to at least eight deaths, according to people familiar with the matter, signaling a new wave of potential woes for manufacturer Trinity Industries Inc.

15.     As a result of this news, shares of Trinity fell $3.43, or over 9.4%, on unusually heavy volume, to close at $32.82 on April 22, 2015.

16.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant is headquartered in this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

21.     Plaintiff, as set forth in the attached Certification, acquired Trinity securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.     Defendant Trinity is a Delaware corporation with its principal executive offices located at 2525 Stemmons Freeway Dallas, TX 75207-2401.  Trinity's common stock trades on the NYSE under the ticker symbol "TRN."

23.     Defendant Timothy R Wallace ("Wallace") has served at all relevant times as the Company's Chief Executive Officer ("CEO"), President, and Chairman.

24.     Defendant James E Perry ("Perry") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Senior Vice President.

25.     The defendants referenced above in ¶¶ 21 and 22 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Trinity Industries, Inc. provides various products and services for the energy, transportation, chemical, and construction sectors in the United States and internationally. Its Construction Products Group segment offers highway products, such as guardrail, crash cushions, and other protective barriers; and aggregates, including expanded shale and clay, crushed stone, sand and gravel, asphalt rock, and other products, as well as other steel products for infrastructure-related projects. This segment also provides hot-dip galvanizing services to fabricated steel materials manufacturers; and trench shields and shoring products for the construction industry, as well as construction equipment for the mining industry. The company was founded in 1933, is headquartered in Dallas, Texas, and its shares trade on the NYSE under the ticker symbol "TRN".

27.     In an article published by *Bloomberg News* on June 12, 2014, a brief history of the design advancements in guardrails installed along highways is provided:

> It was the dawn of a new era in roadside safety. The guardrails with exposed ends that were the standard into the early 1960s could spear cars that hit them. Later, road crews buried the ends of some guardrails - but those, it turned out, could serve as ramps, causing cars that hit them to roll over.
>
> In 1989, a company called Syro Steel Co. introduced a product named ET-2000, an energy-absorbing end terminal designed by Texas A&M University and funded by the Texas Department of Transportation.
>
> The ET-2000 did for guardrails what air bags did for cars. When a car hit Syro's end terminal, the mechanism would act as a buffer that would absorb energy as it pressed into the rail behind it - forcing the W-shaped guardrail through a slot and flattening it into a ribbon of steel that deflected away from the car.
>
> Trinity Industries bought Syro in 1992. In 2000, Trinity received approval from the FHWA for its ET-Plus, a lighter version of the ET-2000, according to the FHWA acceptance letter that unlocked federal funding.

**Materially False and Misleading
Statements Issued During the Period**

28.     On February 15, 2012, after the close of trading, the Company issued a press release announcing its financial and operating results for the fourth quarter and full year ended December 31, 2011. On February 16, 2012, the press release was included in a Form 8-K filed with the SEC. For the fourth quarter, the Company reported net income of $56.1 million, or $0.70 per common diluted share, on revenue of $941.5 million, compared to net income of $17.3 million, or $0.22 per common diluted share, on revenue of $636.0 million for same period in the prior year. For the full year, the Company reported net income of $142.2 million, or $1.77 per common diluted share, on revenue of $3.1 billion, compared to net income of $67.4 million, or $0.85 per common diluted share, on revenue of $2.2 billion for the prior year.

29.     On February 16, 2012, the Company filed a Form 10-K with the SEC which was signed by Defendants Wallace and Perry, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.     In the Form 10-K, the Company stated, in part:

> Our highway products businesses are leading U.S. manufacturers of highway products. We manufacture guardrail, crash cushions, and other protective barriers. The Federal Highway Administration, which determines which products are eligible for federal funds for highway projects, has approved most of our products as acceptable permanent and construction zone highway hardware according to requirements of the National Cooperative Highway Research Program.

Our crash cushions and other protective barriers include multiple proprietary products manufactured through various product license agreements with certain public and private research organizations and inventors. We hold patents and are a licensee for certain of our guardrail and end-treatment products, which enhances our competitive position for these products.

31. On April 25, 2012, the Company issued a press release announcing its financial and operating results for the first quarter ending March 31, 2012. On April 26, 2012, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $52.9 million, or $0.66 per common diluted share, on revenue of $467.1 million, compared to net income of $24.2 million, or $0.30 per common diluted share, on revenue of $219.8 million for same period in the prior year.

32. On April 26, 2012, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33. On July 25, 2012, the Company issued a press release announcing its financial and operating results for the second quarter ending June 30, 2012. On July 26, 2012, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $67.8 million, or $0.84 per common diluted share, on revenue of $1,028.4 million, compared to net income of $67.8 million, or $0.84 per common diluted share, on revenue of $708.3 million for same period in the prior year.

34. On July 26, 2012, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications

pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     On October 24, 2012, the Company issued a press release announcing its financial and operating results for the third quarter ending September 30, 2012. On October 25, 2012, the press release was included in a Form 8-K filed with the SEC.  The Company reported net income of $63.2 million, or $0.80 per common diluted share, on revenue of $937.5 million, compared to net income of $63.2 million, or $0.80 per common diluted share, on revenue of $791.1 million for same period in the prior year.

36.     On October 25, 2012, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On February 20, 2013, the Company issued a press release announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2012. On February 21, 2013, the press release was included in a Form 8-K filed with the SEC. For the fourth quarter, the Company reported net income of $71.3 million, or $0.90 per common diluted share, on revenue of $1.0 billion, compared to net income of $56.1 million, or $0.70 per common diluted share, on revenue of $914.3 million for same period in the prior year. For the full year, the Company reported net income of $255.2 million, or $3.19 per common diluted share, on

revenue of $3.8 billion, compared to net income of $142.2 million, or $1.77 per common diluted share, on revenue of $2.9 billion for the prior year.

38.     On February 21, 2013, the Company filed a Form 10-K with the SEC which was signed by Defendants Wallace and Perry, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     In the Form 10-K, the Company announced that it was a defendant in a False Claims Act lawsuit, (the "False Claims Act Lawsuit"), and stated, in part:

> Our highway products businesses are leading U.S. manufacturers of guardrail, crash cushions, and other protective barriers. The Federal Highway Administration, which determines product eligibility for cost reimbursement using federal funds, has approved many of our products as eligible for cost reimbursement based on requirements set forth by the National Cooperative Highway Research Program. Our crash cushion, protective barrier, and guardrail products include multiple proprietary products manufactured under license from certain public and private research organizations and inventors and Company-held patents. We sell highway products in Canada, Mexico, and all 50 states in the U.S. We compete against several national and regional guardrail manufacturers. We also export our proprietary highway products to more than 60 countries worldwide.
>
> *     *     *
>
> **Note 18. Commitments and Contingencies**
>
> In a related matter, on January 28, 2013, the Company was advised that the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT, Case 2:12-cv-00089 -JRG. Although the Company has not received service of process in this litigation, it has obtained a copy of the

complaint. Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval, ostensibly related to the ET-Plus, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus plus treble civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend Mr. Harman's allegations which will likely result in certain legal expenses. ***We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.***

(emphasis added).

40.     On April 29, 2013, the Company issued a press release announcing its financial and operating results for the first quarter ending March 31, 2013. On April 30, 2013, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $79.1 million, or $0.99 per common diluted share, on revenue of $932.9 million, compared to net income of $72.2 million, or $0.91 per common diluted share, on revenue of $896.2 million for same period in the prior year.

41.     On April 30, 2013, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     In the 10-Q, the Company stated, in part:

As previously reported, in a related matter, on January 28, 2013, the Company was advised that the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled JOSHUA HARMAN, on behalf of the UNITED

STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT, Case 2:12-cv-00089-JRG. Although the Company has not received service of process in this litigation, it has obtained a copy of the complaint. Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval, ostensibly related to the ET-Plus, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus plus treble civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend against Mr. Harman's allegations which will likely result in certain legal expenses. ***We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.***

(emphasis added).

43. On July 31, 2013, the Company issued a press release announcing its financial and operating results for the second quarter ending June 30, 2013. On August 1, 2013, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $84.0 million, or $1.06 per common diluted share, on revenue of $1.1 billion, compared to net income of $67.8 million, or $0.84 per common diluted share, on revenue of $995.5 million for same period in the prior year.

44. On August 1, 2013, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.     In the 10-Q, the Company stated, in part:

As previously reported, in a related matter, on January 28, 2013, the Company was advised that the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled <u>JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT,</u> Case 2:12-cv-00089-JRG. Although the Company did not receive service of process with respect to the Original Complaint, the Company was served with Mr. Harman's Amended Complaint on May 17, 2013. Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval, ostensibly related to the ET-Plus, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus plus treble civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend against Mr. Harman's allegations which will likely result in certain legal expenses. ***We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.***

(emphasis added).

46.     On October 30, 2013, the Company issued a press release announcing its financial and operating results for the third quarter ending September 30, 2013. On October 31, 2013, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $214.7 million, or $0.47 per diluted share, on revenue of $3.07 billion, compared to net income of $242.9 million, or $0.55 per diluted share, on revenue of $2.52 billion, for the same period in the prior year.

47.     On October 31, 2013, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating

that the financial information contained in the Form 10-Q was accurate, and disclosed any

material changes to the Company's internal control over financial reporting.

48.    In the 10-Q, the Company stated, in part:

As previously reported, on January 28, 2013, the Company was advised that the
United States filed a "Notice of Election to Decline Intervention" in a False
Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United
States District Court for the Eastern District of Texas, Marshall Division styled
JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA,
PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC.,
DEFENDANT, Case 2:12-cv-00089-JRG. Although the Company did not receive
service of process with respect to the Original Complaint, the Company was
served with Mr. Harman's Amended Complaint on May 17, 2013. Mr. Harman
alleges that the Company presented false or fraudulent claims, records or
statements to the United States to obtain payment or approval, ostensibly related
to the ET-Plus, and seeks damages equaling the cost to recall and replace all
installations of the ET-Plus plus treble civil penalties, costs, and interest. The
Company notes that since its introduction in 2000, including all improvement
modifications thereafter, the ET-Plus has satisfied the testing criteria required by
the governing National Cooperative Highway Research Program Report 350 and
the product approval requirements of the Federal Highway Administration. The
Company intends to vigorously defend against Mr. Harman's allegations which
will likely result in certain legal expenses. ***We do not believe that a loss is
probable nor can a range of losses be determined. Accordingly, no accrual or
range of loss has been included in the accompanying consolidated financial
statements.***

(emphasis added).

49.    On February 19, 2014, the Company issued a press release announcing its

financial and operating results for the fourth quarter and fiscal year ended December 31, 2013.

On February 20, 2014 the press release was included in a Form 8-K filed with the SEC. For the

fourth quarter, the Company reported net income of $112.8 million, or $1.44 per common diluted

share, on revenue of $1.3 billion, compared to net income of $71.3 million, or $0.90 per common

diluted share, on revenue of $1.0 billion for same period in the prior year. For the full year, the

Company reported net income of $375.5 million, or $4.75 per common diluted share, on revenue

of $4.4 billion, compared to net income of $255.2 million, or $3.19 per common diluted share, on revenue of $3.8 billion for the prior year.

50.     On February 20, 2014, the Company filed a Form 10-K with the SEC which was signed by Defendants Wallace and Perry, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     In the Form 10-K, the Company stated, in part:

> Our highway products businesses are leading U.S. manufacturers of guardrail, crash cushions, and other protective barriers. The Federal Highway Administration, which determines product eligibility for cost reimbursement using federal funds, has approved many of our products as eligible for cost reimbursement based on requirements set forth by the National Cooperative Highway Research Program. Our crash cushion, protective barrier, and guardrail products include multiple proprietary products manufactured under license from certain public and private research organizations and inventors and Company-held patents. We sell highway products in Canada, Mexico, and throughout the U.S and we export highway products, including proprietary products to more than 60 countries. We compete against several national and regional guardrail manufacturers.

*     *     *

> As previously reported, on January 28, 2013, the Company was advised that the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT, Case 2:12-cv-00089-JRG. Although the Company did not receive service of process with respect to the Original Complaint, the Company was served with Mr. Harman's Amended Complaint on May 17, 2013. Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval related to the Company's ET-Plus guardrail end-terminal, and seeks damages equaling the cost

to recall and replace all installations of the ET-Plus trebled, plus civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend against Mr. Harman's allegations which will likely result in certain legal expenses. ***We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.***

(emphasis added).

52.     On April 29, 2014, the Company issued a press release announcing its financial and operating results for the first quarter ending March 31, 2013. On April 30, 2014, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $226.4 million, or $2.85 per common diluted share, on revenue of $1.5 billion, compared to net income of $79.1 million, or $0.99 per common diluted share, on revenue of $932.9 million for same period in the prior year.

53.     On April 30, 2014, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

54.     In the 10-Q, the Company stated, in part:

As previously reported, on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled Joshua Harman, on behalf of the United States of America, Plaintiff/Relator ("Mr. Harman") v. Trinity Industries, Inc., Defendant, Case 2:12-cv-00089-JRG. Although the Company did not receive service of process with respect to the Original Complaint, the Company was served with Mr. Harman's Amended Complaint on May 17, 2013. The trial is

currently set by the U.S. District Court for July 14, 2014. Mr. Harman alleges the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval related to the Company's ET-Plus guardrail end-terminal, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus trebled, plus civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend against Mr. Harman's allegations which will likely result in certain legal expenses. ***We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.***

(emphasis added).

55.     On May 5, 2014, the Company issued a press release announcing the declaration of a 2-for-1 stock split and a 33% increase in its quarterly dividend. In the press release the Company stated, in part:

> Trinity Industries, Inc. (NYSE:TRN) has today declared a 2-for-1 stock split. The stock split will be issued in the form of a 100% stock dividend. The additional shares will be distributed on June 19, 2014 to shareholders of record at the close of business on June 5, 2014. Trading is expected to begin at the split-adjusted price on June 20, 2014.
>
> In addition, the Company declared a 33% increase in its quarterly dividend. On a stock-split adjusted basis, the Company increased its quarterly dividend to 10 cents per share on its $1.00 par value common stock compared to the current, split-adjusted level of 7.5 cents per share. The quarterly cash dividend, representing Trinity's 201st consecutively paid dividend, is payable July 31, 2014 to stockholders of record on July 15, 2014, and will be made on the new shares after the 2-for-1 stock split.

56.     On July 29, 2014, the Company issued a press release announcing its financial and operating results for the second quarter ending June 30, 2014. On July 30, 2014, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $164.2 million, or $1.01 per common diluted share, on revenue of $1.5 billion, compared to net

income of $84.0 million, or $0.52 per common diluted share, on revenue of $1.1 billion for same period in the prior year.

57.    On July 30, 2014, the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.    In the 10-Q, the Company stated, in part:

As previously reported, on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled Joshua Harman, on behalf of the United States of America, Plaintiff/Relator ("Mr. Harman") v. Trinity Industries, Inc., Defendant, Case 2:12-cv-00089-JRG. Although the Company did not receive service of process with respect to the Original Complaint, the Company was served with Mr. Harman's Amended Complaint on May 17, 2013. The trial began on July 14, 2014 and ended in a mistrial on July 18, 2014. The case is expected to be retried in the fall of 2014. Mr. Harman alleges the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the product in order for such purchasers to obtain payment or approval (eligibility for Federal-aid reimbursement) related to the Company's ET-Plus guardrail end-terminal system. Mr. Harman is seeking damages equaling the amount the United States paid in federal-aid reimbursement for ET-Plus systems from March 6, 2006 to December 31, 2013, less the value of the ET-Plus systems received, trebled, plus civil penalties. Mr. Harman's most recent damage model calculates this amount at approximately $775.7 million exclusive of attorney's fees, costs, and interest. The Company intends to vigorously defend itself against Mr. Harman's allegations which will result in certain legal expenses.

Since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus system has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration ("FHWA"). As affirmed in a Memorandum dated June 17, 2014, the FHWA advised its Division Administrators, Directors of Field Services, Federal Lands Division Engineers, and Safety Field that "The Trinity ET-Plus with 4-inch guide

channels became eligible for Federal reimbursement under FHWA letter CC-94 on September 2, 2005. In addition, the device is eligible for reimbursement under FHWA letters CC-94A and CC-120. Staff confirmed the reimbursement eligibility of the device at heights from 27 3/4 inches to 31 inches. An unbroken chain of eligibility for Federal-aid reimbursement has existed since September 2, 2005 and the ET-Plus continues to be eligible today." This Memorandum is available on the FHWA's web site at:

> http://safety.fhwa.dot.gov/roadway_dept/policy_guide/road_hardw
> are/memo_etplus_wbeam.cfm

Based upon the unbroken chain of eligibility of the ET-Plus system for Federal-aid reimbursement, *we do not believe that a loss is probable or that a range of reasonably possible losses exists. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.*

(emphasis added).

### The Truth Begins To Emerge

59.     Despite the fact that Defendants continuously touted their "belief" that a loss was not "probable" in the False Claims Act Lawsuit, and the Company's touted compliance with the FHWA's product approval requirements, the Company had in fact made numerous changes to the design of the ET-Plus system without properly ensuring the safety of the design and without securing the necessary approval from the FHWA.

60.     On October 12, 2014, an article was published in the *New York Times*, reporting that at least three states had banned the use of guardrail heads manufactured by Trinity. The article stated, in part:

> Federal highway officials had long insisted that guardrails throughout the state were safe. But some guardrail heads had apparently malfunctioned, in essence turning the rails into spears when cars hit them and injuring people instead of cushioning the blow, Missouri officials said.
>
> "The device is not always performing as it is designed and intended," a Missouri transportation official wrote of the problematic rail heads in an internal communication.
>
> Because of its safety concerns, Missouri banned further installation of the rail heads on Sept. 24. It joined Nevada, which prohibited further purchases in

January, and was followed six days later by Massachusetts. Lawsuits say the guardrails were to blame for five deaths, and many more injuries, in at least 14 accidents nationwide.

The Federal Highway Administration, the agency charged with ensuring the safety of the nation's roads, continues to say that the guardrails, installed on highways in almost every state, meet crash-test criteria. And the Texas-based manufacturer, Trinity Industries, a large supplier of guardrails nationwide, also denies there is a problem.

But internal communications and documents from the highway administration show that a senior engineer charged with examining the guardrails expressed reservations about their safety, before he signed off on their continued use about two years ago.

At one point, agency officials drafted a letter asking the manufacturer to conduct additional testing, but the letter was never sent, according to interviews and a review of the documents by The New York Times.

*       *       *

In a separate email to an outside safety expert a month later, Mr. Artimovich wrote that it was "hard to ignore the fatal results."

The federal agency continues to allow states to use federal funds to purchase and install the rail heads. Concerns over the guardrails are at the center of a federal lawsuit expected to go to trial on Monday in Marshall, Tex.

*       *       *

At the heart of the issue is a change to the guardrail that Trinity made in 2005.

Trinity's new design reduced the width of the steel channel behind the rail head at the end of the guardrail, from five inches to four. Instead of sliding along the rail, which collapses much like an accordion, and helping it curl out of the way of the oncoming vehicle, the rail head can become jammed, some state officials say. In those cases, the long metal guardrail does not get pushed aside — instead, it can become a bayonet that can pierce the vehicle and any person in its way, the state officials say.

Design changes, along with detailed diagrams, are supposed to be disclosed to the Federal Highway Administration.

But when Trinity narrowed its rail head design it did not make any such disclosures. In response to a question from The Times, Trinity said it submitted results of the crash tests to the agency in 2005, though it did not directly address whether it highlighted the change to the rail head.

\*         \*         \*

Nevada stopped further purchases of the ET-Plus in January, citing Trinity's failure to disclose the change in 2005. Last month, Massachusetts and Missouri issued bans of their own.

61.     As a result of this news, shares of Trinity fell $2.06 or 5.9% on unusually heavy volume, to close at $32.88 on October 13, 2014.

62.     On October 14, 2014, after the close of trading, the *New York Times* published an article reporting that the State of Virginia threatened to remove guardrails sold by Trinity unless it performs additional safety tests. The article stated, in part:

> Concern is mounting over the safety of guardrails sold by Trinity Industries, as yet another state has threatened to stop buying them, and will consider removing them.

> Virginia, in a letter sent to the company on Friday, told Trinity that state transportation officials did not believe Trinity had properly tested the end of a guardrail it redesigned in 2005. Virginia officials also told Trinity, which is based in Dallas, that the company had made changes to the design without telling them.

> If the company does not conduct new tests, in the presence of Virginia officials, and provide proof to the state's Transportation Department by Oct. 24, the state will ban the product, officials said.

63.     As a result of this news, shares of Trinity fell $0.53 or over 1.5% on unusually heavy volume, to close at $32.93 on October 15, 2014.

64.     On October 20, 2014, a jury found that Trinity deliberately withheld information from the U.S. about cost-saving changes to its highway guardrail system that made it more dangerous, ruling the company defrauded the government out of $175 million. The verdict was the result of whistleblower lawsuit, brought by Joshua Harman, which claimed that Trinity made secret design changes that transformed one of its products into a potentially lethal highway hazard, wrongly passing off the product as eligible for federal funding and defrauding the government of $218 million.

65.     The same day, an article was published by *Bloomberg News*, reporting on the jury's verdict, and stating, in part:

> Damages to be awarded against the company will be tripled and added to a penalty to be determined by the judge. The total liability may reach as much as $1 billion, according to company attorneys.
>
> The jury's verdict comes as scrutiny of the highway safety product, called the ET-Plus, increases across the country. Earlier this month, the Federal Highway Administration asked all states to start submitting information on crashes involving the ET-Plus to the agency's safety office. Four states have banned new installations of it on their highways, citing ongoing investigations. And the company faces more than a dozen personal injury and wrongful death lawsuits in which plaintiffs allege the product behaved defectively in car crashes.

66.     As a result of this news, shares of Trinity fell $4.42 or over 12.3%, on unusually heavy volume, to close at $31.42 on October 20, 2014.

67.     On October 24, 2014, after the close of trading, the Company issued a press release announcing that it was stopping shipments of its of ET-Plus System. In the press release, the Company stated, in part:

> Trinity Highway Products, LLC announced today that it will stop the shipment of the ET-Plus® System until additional crash testing can be completed.
>
> The Federal Highway Administration (FHWA) recently requested additional crash testing of the ET-Plus® System in support of its ongoing evaluation of the ET-Plus® System. The Company will continue working with FHWA related to further testing and will stop shipment of the product until requested testing is completed.
>
> "In light of FHWA's request, the right thing to do is to stop shipping the product until the additional testing has been completed," said Gregg Mitchell, President, Trinity Highway Products, LLC. "We have confidence in the ET-Plus® System as designed and crash tested by Texas A&M Transportation Institute. It has met all tests previously requested by FHWA. We take the safety of the products we manufacture very seriously," Mitchell said.

68.     As a result of this news, shares of Trinity fell $0.45 or over 1.2%, to close at $34.85 on October 25, 2014.

69.     On October 28, 2014, the Company issued a press release announcing its financial and operating results for the third quarter ending September 30, 2014. On October 29, 2014, the press release was included in a Form 8-K filed with the SEC. The Company reported net income of $149.4 million, or $0.90 per common diluted share, on "record" revenue of $1.56 billion, compared to net income of $99.6 million, or $0.63 per common diluted share, on revenue of $1.11 billion for same period in the prior year.

70.     On October 29, 2014 the Company filed a Form 10-Q with the SEC which was signed by Defendant Perry, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wallace and Perry, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71.     In the 10-Q, the Company stated, in part:

We previously reported that on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act ("Act") complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division ("District Court") styled Joshua Harman, on behalf of the United States of America, Plaintiff/Relator v. Trinity Industries, Inc., Defendant, Case 2:12-cv-00089-JRG. Mr. Harman alleged the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the Company's ET-Plus® System, a highway guardrail end-terminal ("ET-Plus"), in order for such purchasers to obtain federal-aid reimbursement for payments made on such purchases. On October 20, 2014 a trial of this case concluded with a jury verdict stating that the Company and its subsidiary, Trinity Highway Products, LLC, "knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million. Additionally, the District Court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The District Court has the discretion to establish the civil penalty amount between $5,500 and $11,000 per violation. In this regard, the Relator contended during

trial that certain invoices submitted to purchasers of the ET-Plus certified that the product was accepted by the Federal Highway Administration ("FHWA") and was therefore eligible for federal-aid reimbursement. Based on Relator's damages model in this respect, the range of possible civil penalties is $5,500 (if the District Court determines there has been a single violation) to $184 million (if the District Court determines that each invoice for the product was a violation).

The District Court has not yet entered a final judgment or determined a civil penalty amount. While the Company believes the District Court does not have the evidence required under the law to quantify civil penalties, the range of loss in this case, based on the jury's verdict and Mr. Harman's damage model for civil penalties, is $525 million to $709 million, exclusive of attorney's fees, costs, and interest.

*     *     *

On October 21, 2014, the FHWA advised the Company that in light of the jury's finding the Company must perform additional crash testing of the ET-Plus to support the FHWA's ongoing evaluation of ET-Plus performance. On October 24, 2014, the Company issued a press release stating that it will stop shipments of the ET-Plus until additional crash testing of the ET-Plus can be completed. Prior to the Company's press release, certain states had either removed the ET-Plus from their respective qualified products list or suspended further purchases of the ET-Plus pending the outcome of the FHWA-requested crash tests. The state of Virginia is also evaluating a potential recall of all ET-Plus products installed on Virginia roadways. Other states could take similar or different actions. While the financial impacts of such actions are currently unknown, they could be material. The Company is working with the FHWA to develop a plan for performing the requested crash testing and analysis.

*     *     *

The Company is currently defending a number of product liability lawsuits in several different states that are alleged to involve the ET-Plus. These cases are diverse in light of the randomness of collisions in general and the fact that each accident involving roadside devices such as an ET-Plus, or any other fixed object along the highway has its own unique facts and circumstances. Report 350 recognizes that performance of even the most carefully researched roadside device is subject to physical laws and the crash worthiness of vehicles. While the Company is vigorously defending these lawsuits, the recent verdict in the Harman matter may affect the ultimate outcome in one or more of these cases. Moreover, the Company expects the recent verdict, coupled with the media attention the verdict has generated, will prompt the plaintiff's bar to seek out vehicle accident victims involved in collisions with an ET-Plus as potential clients, which may result in additional product liability lawsuits being filed against the Company. The Company carries general liability insurance to mitigate the impact of adverse verdict exposures in these cases.

72.    On February 18, 2015, the Company issued a press release announcing its

financial and operating results for the fourth quarter and fiscal year ended December 31, 2014.

On February 19, 2015, the press release was included in a Form 8-K filed with the SEC. For the

fourth quarter, the Company reported net income of $138.2 million, or $0.86 per common diluted

share, on "record" revenue of $1.7 billion, compared to net income of $112.8 million, or $0.72

per common diluted share, on revenue of $1.3 billion for same period in the prior year. For the

full year, the Company reported net income of $678.2 million, or $4.19 per common diluted

share, on revenue of $6.2 billion, compared to net income of $375.5 million, or $2.38 per

common diluted share, on revenue of $4.4 billion for the prior year.

73.    On February 19, 2015, the Company filed a Form 10-K with the SEC which was

signed by Defendants Wallace and Perry, and reiterated the Company's previously announced

quarterly and fiscal year-end financial results and financial position. In addition, the 10-K

contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by

Defendants Wallace and Perry, stating that the financial information contained in the Form 10-K

was accurate and disclosed any material changes to the Company's internal control over

financial reporting.

74.    In the Form 10-K, the Company stated, in part:

We previously reported that on January 28, 2013, the United States filed a
"Notice of Election to Decline Intervention" in a False Claims Act ("Act")
complaint filed under seal on March 6, 2012 in the United States District Court
for the Eastern District of Texas, Marshall Division ("District Court") styled
Joshua Harman, on behalf of the United States of America, Plaintiff/Relator v.
Trinity Industries, Inc., Defendant, Case 2:12-cv-00089 -JRG. Mr. Harman
alleged the Company knowingly presented or caused to be presented a false or
fraudulent claim, record or statement to purchasers of the Company's ET-Plus®
System, a highway guardrail end-terminal ("ET Plus"), in order for such
purchasers to obtain Federal-aid reimbursement for payments made on such
purchases. On October 20, 2014 a trial of this case concluded with a jury verdict
stating that the Company and its subsidiary, Trinity Highway Products, LLC,

"knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million . Additionally, the District Court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The District Court has the discretion to establish the civil penalty amount between $5,500 and $11,000 per violation. In this regard, the Relator contended during trial that certain invoices submitted to purchasers of the ET Plus certified that the product was accepted by the Federal Highway Administration ("FHWA") and was therefore eligible for Federal-aid reimbursement. Based on Relator's damages model in this respect, the range of possible civil penalties is $5,500 (if the District Court determines there has been a single violation) to $184 million (if the District Court determines that each invoice for the product was a violation).

The District Court has not yet entered a final judgment or determined a civil penalty amount. While the Company believes the District Court does not have the evidence required under the law to quantify civil penalties, the total range of loss in this case, based on the jury's verdict and Mr. Harman's damage model for civil penalties, is $525 million to $709 million , exclusive of attorney's fees, costs, and interest.

*       *       *

On October 21, 2014, in light of the jury's finding, the FHWA requested that the Company perform eight (8) additional crash tests of the ET Plus to support the FHWA's ongoing evaluation of ET Plus performance. The eight tests were comprised of four tests at a guardrail height of 27 3/4" and four tests at a guardrail height of 31". On October 24, 2014, the Company issued a press release stating that it will stop shipments of the ET Plus until additional crash testing of the ET Plus was completed. The requested tests were conducted in December 2014 and January 2015, in accordance with Report 350 at Southwest Research Institute, an FHWA-approved and independent research facility. Report 350 sets forth the performance evaluation criteria applicable to the ET Plus and many other roadside safety features used on U.S. highways. The ET Plus extruder heads tested in all eight tests were randomly selected by the FHWA from inventory at the California Department of Transportation. These extruder heads were representative of what is in use on U.S. and Canadian highways.

75.     On April 22, 2015, an article was published by *Bloomberg News*, reporting that Trinity was at the center of a Federal Criminal Probe. The article stated, in part:

> The U.S. Justice Department is conducting a criminal investigation into the use of a highway guardrail system linked to at least eight deaths, according to people familiar with the matter, signaling a new wave of potential woes for manufacturer Trinity Industries Inc.

76.     As a result of this news, shares of Trinity fell $3.43, or over 9.4%, on unusually heavy volume, to close at $32.82 on April 22, 2015.

77.     The statements referenced in ¶¶ 28-54, 56-58, and 69-74 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) Trinity changed certain dimensions of the ET-Plus in 2005 without notifying or receiving authorization from the Federal Highway Administration ("FHWA"), the government agency that certifies the safety of roadside hardware; and (2) as a result of the foregoing, Trinity's public statements were materially false and misleading at all relevant times.

78.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Trinity securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Trinity securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Trinity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

82.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Trinity;

- whether the Individual Defendants caused Trinity to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Trinity securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

85.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Trinity securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Trinity securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

86.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

87.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

88.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Trinity securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire Trinity securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

91.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Trinity securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Trinity's finances and business prospects.

92.      By virtue of their positions at Trinity, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

93.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Trinity securities from their personal portfolios.

94.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Trinity, the Individual Defendants had knowledge of the details of Trinity's internal affairs.

95.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Trinity.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Trinity's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Trinity securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Trinity's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Trinity securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

96.     During the Class Period, Trinity securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Trinity securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise

acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Trinity securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Trinity securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

97.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

99.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.    During the Class Period, the Individual Defendants participated in the operation and management of Trinity, and conducted and participated, directly and indirectly, in the conduct of Trinity's business affairs.  Because of their senior positions, they knew the adverse non-public information about Trinity's misstatement of income and expenses and false financial statements.

101.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Trinity's financial condition and results of operations, and to correct promptly any public statements issued by Trinity which had become materially false or misleading.

102.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Trinity disseminated in the marketplace during the Class Period concerning Trinity's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Trinity to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Trinity within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Trinity securities.

103.     Each of the Individual Defendants, therefore, acted as a controlling person of Trinity.  By reason of their senior management positions and/or being directors of Trinity, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Trinity to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Trinity and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

104.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Trinity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 27, 2015

Respectfully submitted,

**ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND**

By: */s/* Sammy Ford IV
Sammy Ford IV
Federal Bar Number: 950682
Texas Bar Number: 24061331
800 Commerce Street
Houston, TX 77002
Telephone: 713-222-7211
Facsimile: 713-225-0827

**POMERANTZ, LLP**
Jeremy A. Lieberman
C. Dov Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:   (212) 661-1100
Facsimile:    (212) 661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
***Attorneys for Plaintiff***